**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**EVANSVILLE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA, et al.,** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | **CAUSE NO. 3:09-cv-128-WTL-WGH** |
| ) | |
| **THE CITY OF EVANSVILLE, INDIANA, et al.,** ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| **THE CITY OF EVANSVILLE, INDIANA, et al.,** ) | |
| ) | |
| Third-Party Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| **ENVIRONMENTAL MANAGEMENT CORP.,** ) | |
| ) | |
| Third-Party Defendant. ) | |

**ENTRY ON MOTION TO ENTER CONSENT DECREE**

This case is before the Court on the Plaintiffs' Joint Motion in Support of Entry of Consent Decree (dkt. no. 127) filed by Plaintiffs the United States of America and the State of Indiana. Third-Party Defendant Environmental Management Corporation ("EMC") has filed a response in opposition to entry of the proposed consent decree and has asked the Court to hold a hearing regarding its objections to the proposal. For the reasons set forth below, the Court, being duly advised, **OVERRULES** EMC's objections, **DENIES** EMC's request for a hearing, and **GRANTS** the Plaintiffs' motion for entry of the proposed consent decree. In light of this ruling, EMC's objection to Magistrate Judge Hussman's ruling lifting the stay of the third-party litigation is **OVERRULED AS MOOT**.

**BACKGROUND**

The Plaintiffs filed this case against Defendant City of Evansville, Indiana ("the City") in September 2009[1] seeking injunctive relief and civil penalties for alleged violations of the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq.*, and Title 327 of the Indiana Administrative Code. Specifically, the Plaintiffs allege that the City has failed to comply with the terms of various National Pollutant Discharge Elimination System ("NPDES") permits it has been issued by the Indiana Department of Environmental Management ("IDEM").[2] The amended complaint asserts that the City's wastewater and sewer system was poorly maintained, poorly operated, and of insufficient capacity, and as a result the system failed to collect and treat all wastewater, allowing untreated sewage and other harmful pollutants to be discharged into various waters that flow in and around Evansville, including the Ohio River, Pigeon Creek, Bee Slough, and Carpentier Creek.

Evansville's wastewater and sewer system is comprised of both a combined system, which accounts for approximately 39% of the whole system, and a sanitary system. As the Plaintiffs explain:

> Combined sewer systems, which have not been constructed for decades in the United States, are wastewater collection systems that are designed to carry sanitary wastewater (domestic sewage from homes, as well as industrial and commercial wastewater) and storm water runoff from rainfall or snowmelt in a single system of pipes to a publicly owned treatment works ("POTW"). During dry weather, combined systems convey domestic, commercial, and industrial wastewater and

---

[1]The Plaintiffs amended their complaint in December 2009 to add the Evansville Water and Sewer Utility Board as a defendant. The Defendants will be collectively referred to in this Entry as "the City."

[2]IDEM has been authorized by the United States Environmental Protection Agency("EPA") to administer the NPDES program in Indiana. The permits issued by IDEM implement the CWA as well as the analogous provisions of Indiana environmental law. The CWA provides that the United States may enforce the provisions of NPDES permits issued by states; Indiana law also provides for the state to enforce the permits issued by IDEM.

> limited amounts of infiltrated ground water. Such systems often were designed to overflow when collection system capacity is exceeded, such as during precipitation events, resulting in combined sewer overflows ("CSOs") that discharge excess untreated wastewater (including raw sewage) directly to surface water bodies such as lakes, rivers, estuaries, and coastal waters. CSOs can be a major source of water pollution in communities served by Combined Sewer Systems. CSOs are point source discharges and are subject to NPDES permit requirements.
>
> Sanitary sewer systems are wastewater collection systems owned by a state or municipality that are specifically designed to collect and convey only sanitary wastewater (domestic sewage from homes as well as industrial and commercial wastewater). In such systems, storm water is conveyed through a separate set of pipes. Although originally designed to collect only sewage, sanitary sewers historically have also collected large amounts of rain water during storm events, through infiltration (seepage into unsealed joints or cracks) or inflows (drainage from gutters and roof or other drains that divert storm water, inappropriately, into the sanitary system), resulting in Sanitary Sewer Overflows ("SSOs"). SSOs also occur when normal dry weather flow is blocked for any of several reasons, or when mechanical failures prevent a system from operating properly.

Plaintiffs' Brief at 4 (citing REPORT TO CONGRESS ON THE IMPACTS AND CONTROL OF CSOS AND SSOS at 2-3 (Exh. A to Brief)).

In Evansville, the sewer system leads to two wastewater treatment plants, the East Plant and the West Plant. The City holds an NPDES permit for each of the two plants. During periods of moderate or heavy precipitation, the combined sewer system is designed to overflow into a receiving stream when a certain capacity level is reached, thus diverting flow away from the treatment system and into receiving streams. The City has 22 permitted CSO outfalls that discharge to Bee Slough, Pigeon Creek, and the Ohio River. Each of these bodies of water carry the default designation in Indiana, which is for full-body contact recreational use.

As summarized by the Plaintiffs in their brief, the allegations in the Complaint are that the City:

> 1) discharged untreated sewage in such a way as to cause violations of applicable water quality standards for E. coli in the receiving streams; 2) discharged untreated sewage from the combined sewer collection system during dry weather into "waters of the United States" and "waters of the state"; 3) failed to maximize treatable flow to the East Plant and the West Plant, during wet weather events, causing discharges

3

of untreated sewage from CSO outfalls during times when there is remaining treatment capacity at those plants; 4) failed to properly operate and maintain Evansville's combined sewer and separate sanitary sewer collection systems in violation of the two NPDES permits; 5) illegally discharged untreated sewage from Evansville's sanitary sewer collection systems into navigable waters and their tributaries in violation of the two NPDES permits; 6) created an imminent and substantial endangerment by releasing sewage onto public and private property and into residential dwellings and other buildings; and 7) failed to adequately report discharges from the collection system and CSO outfalls in violation of the reporting provisions in the city's NPDES permits.

Plaintiffs' Brief at 6. The Plaintiffs seek both civil penalties and injunctive relief for Evansville's alleged NPDES permit violations, CWA violations, and state law violations. The City, in turn, filed a third-party complaint for indemnity and breach of contract against EMC, a company with which it had contracted to operate its sewer system.

## SUMMARY OF PROPOSED CONSENT DECREE

After a lengthy period of discovery and several months of negotiations in which Magistrate Judge Hussman was actively involved, the Plaintiffs and the City agreed upon the proposed consent decree ("Decree") that, following the requisite period for public comment, they now ask the Court to approve and enter. The stated objective of the Decree is to require the City "to take steps necessary to comply with the CWA, Indiana Code § 13-30-2-1, the regulations promulgated under those laws, and the NPDES Permits." To that end, the Decree prohibits the City's CSO outfalls from discharging sewage during dry weather and prohibits discharges and releases of sewage from sanitary sewer systems for the East and West Plants, and from the combined sewer systems at places other than CSO outfalls identified in the permits. In addition, the Decree requires detailed reporting of any discharges and releases that occur, including reporting of the remedial measures taken by the City to mitigate the effects of each discharge and release and prevent recurrence.

The Decree also requires the City to take several measures to ensure that it operates its

4

treatment plants at maximum treatable flow during wet weather prior to discharging from CSO outfalls. Specifically, the City is required to install an additional screen and pump at the East Plant that will significantly increase the treatment capacity of that plant; to install additional equipment to increase the capacity of the West Plant; and to evaluate the upgrades at the East and West plants to identify a higher, revised treatable flow rate that it will adhere to during wet weather events before discharging sewage from CSO outfalls. The Decree sets forth various deadlines for satisfying these requirements, ranging from November 2011 to July 2012. The Decree further requires the City to develop and implement a capacity, management, operation, and maintenance ("CMOM") program, consistent with EPA guidance, designed to prevent releases of sewage from the separate sanitary sewer system. The CMOM program, once fully developed, will contain, among other provisions, emergency procedures for responding to releases and discharges of sewage from the sanitary sewer system, provisions for the control of fats, oils, grease and roots that block the sewer system and result in discharges of sewage, and a cleaning and inspection schedule for pipes, manholes, and pump stations in the sewer systems. Additional provisions in the CMOM will ensure adequate backup power for all pump stations and design requirements for new sewer connections. The CMOM is to be designed in three phases, with deadlines for specific actions to be taken ranging from May 2011 to November 2012.

The Decree also requires the City to develop by November 2012 a long-term "Integrated Overflow Control Plan" ("IOCP") to identify and implement infrastructure improvements in both the combined and separate sanitary sewer system that are needed to achieve and maintain compliance with the CWA. The IOCP must have two main components: 1) a Long Term Control Plan that provides for, among other things, construction of infrastructure in the combined sewer system designed to minimize or eliminate the impact of CSO discharges on the Ohio River and Pigeon Creek; and 2) a Sanitary Sewer Remedial Measures Plan that provides for implementation

5

of infrastructure improvements to eliminate the capacity limitations in the sanitary sewer system and prevent discharges of sewage from the sanitary sewer system. Full implementation of the IOCP is to occur by 2032.

In addition to fulfilling these short-term and long-term requirements, the Decree requires the City to pay civil penalties in the amount of $420,000 to the United States and $70,000 to the state of Indiana. Finally, the City agrees to implement a supplemental environmental project ("SEP") pursuant to which it will extend new sewer lines to connect homes with failing septic systems to the city's sewer system. The expected cost of the SEP is between $4 million and $6.5 million. The construction of the sewer extensions must be completed by December 2012, and the effected homeowners must be connected to the new sewer lines by December 2015.

## **DISCUSSION**

In deciding whether it is appropriate to approve and enter a proposed consent decree, the Court "must defer to the expertise of the agency and to the federal policy encouraging settlement" and "must approve a consent decree if it is reasonable, consistent with [the CWA's] goals, and substantively and procedurally fair." *U.S. v. George A. Whiting Paper Co.*, ___ F.3d ____, 2011 WL 1662833 at *2 (7th Cir., May 4, 2011) (reviewing approval of consent decree in CERCLA case); *see also U.S. v. Lexington-Fayette Urban County Government*, 591 F.3d 484, 489 (6th Cir. 2010) (consent decree in CWA case must be approved if it is "fair, adequate, and reasonable, as well as consistent with the public interest"). The court in *United States v. BP Exploration & Oil Co.*, 167 F. Supp.2d 1045, 1049-50 (N.D. Ind. 2001) (citations omitted), aptly described the judicial review process as follows:

> The underlying purpose of this review is to determine whether the decree adequately protects and is consistent with the public interest. In other words, a consent decree will not be approved where the agreement is illegal, a product of collusion, inequitable, or contrary to the public good. In reviewing a consent decree, this Court need not inquire into the precise legal rights of the parties, nor

6

reach and resolve the merits of the parties' claims. Rather, it is ordinarily sufficient if this Court determines whether the consent decree is appropriate under the particular facts of the case. In its review, the Court must keep in mind the strong policy favoring voluntary settlement of litigation. This presumption is particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal agency, like the [EPA], which enjoys substantial expertise in the environmental field. Although this Court should pay deference to the judgment of the government agency which has negotiated and submitted a proposed decree, this Court must avoid any rubberstamp approval in favor of an independent evaluation. However, this Court must not substitute its judgment for that of the parties nor conduct the type of detailed investigation required if the parties were actually trying the case. The test is not whether this Court would have fashioned the same remedy nor whether it is the best possible settlement.

Applying these principles to the case at bar, the Court has no trouble determining that the Decree should be approved. The terms of the Decree were the product of the parties' extensive negotiations with the substantial involvement of Magistrate Judge Hussman. There is absolutely no indication that the negotiations were anything other than arms-length or that the resulting agreement was anything other than a fair and reasonable resolution based upon the considered judgment of the parties regarding the relative strength of their legal positions, the expense of continuing the litigation, and the probability that either side would achieve a more favorable outcome at trial. Further, while the measures outlined in the Decree certainly will not solve the City's sewage problems overnight, no quick-fix solution exists for those problems, and the settlement has the distinct advantage of beginning the implementation of ameliorating measures sooner rather than later–likely much, much later by the time the litigation of this case could be seen to its ultimate conclusion.[3] Therefore the Decree clearly is consistent with the public's interest in improving the quality of Evansville's water.

### *EMC's Objections*

None of the arguments advanced by EMC in its objections to the instant motion persuade

---

[3]This is assuming, of course, that the Plaintiffs would ultimately be successful in obtaining the relief sought in their complaint.

the Court that terms of the Decree are not fair, reasonable, and consistent with the CWA. Indeed, most of EMC's arguments, each of which is addressed, in turn, below, appear to stem from EMC's concern over how the terms of the Decree might affect the City's third-party action against EMC, rather than whether entry of the Decree would further the goals of the CWA.

*Language Objected to by EMC*

EMC first objects to certain provisions in the Decree that EMC portrays as being "designed to benefit the City in its third-party claim against EMC." EMC Brief at 8. The provisions in question read as follow:

> By paying civil penalties and implementing supplemental environmental projects, the Defendants do not release Environmental Management Corporation and will not dismiss their third party action for damages (specifically including these civil penalties and the costs of the supplemental environmental projects) while Environmental Management Corporation was a co-permittee and/or engaged in the operation and management of the Evansville WWTPs and Sewer System.
>
> * * *
>
> Defendants will not receive any reimbursement for any portion of the SEP from any person, except as permitted by Paragraph 50.e

Decree at ¶ 50.e, ¶ 53.e. EMC is particularly concerned with the parenthetical in ¶ 50.e, which it argues "at a minimum takes a position on whether the civil penalty and costs of the SEP are damages in the third-party complaint." EMC Brief at 8. The Court disagrees. The parenthetical clearly modifies the phrase "third party action for damages"; accordingly, it does nothing more than describe what the City *claims* in its third-party complaint. There is no question that the City *claims* it is entitled to recover as damages any amount it pays in conjunction with settling this case, but the Decree does not purport to address the question of whether the City is actually entitled to do so. Accordingly, there is no ground for rejecting the Decree on the basis of the language quoted above.

*Procedural Fairness*

8

EMC argues that the Decree is not procedurally fair because neither it nor the City's insurers were included in all of the negotiations regarding it. With regard to the City's insurers, EMC points to the fact that Magistrate Judge Hussman's scheduling order setting a settlement conference in this case contains the following language: "Any insurance company that is a party, or is contractually required to defend or indemnify any party, in whole or in part, must have a fully authorized settlement representative present at the conference." (Docket No. 99). The purpose of this requirement, which is part of Magistrate Judge Hussman's standard instructions regarding the settlement conferences he conducts, is to avoid a situation in which a settlement cannot be finalized during the settlement conference because a party must obtain approval from an insurance company that ultimately will be funding the settlement. That was not an issue in this case; the City could and ultimately did obligate itself to the terms of the Decree without approval or input from its insurers, who apparently do not believe that they are contractually required to defend or indemnify the City in this case, inasmuch as that issue is the subject of separate litigation. Accordingly, the quoted provision in the scheduling order was inapplicable to this case.

Likewise, despite EMC's protestations, the Court is not troubled by the fact that EMC was not included in all of the settlement negotiations in this case. EMC was initially included in settlement talks, presumably because the Magistrate Judge was hoping to broker a global settlement that included the City's claims against EMC, but when that did not materialize the final terms of the Decree–including, apparently, the quoted paragraphs–eventually were arrived at as a result of negotiations in which EMC was not involved. While EMC complains bitterly that it was excluded from these talks and characterizes the negotiations as therefore being "unfair," it points to no support for its argument that third parties must be (or even should be) included in settlement negotiations in such cases. Indeed, involving a third-party who, like EMC, likely has interests that conflict with the goals of the CWA is unlikely to aid the process of arriving at a settlement that

9

furthers those goals.

*Amount of Civil Penalty*

EMC next argues that the Plaintiffs have not demonstrated that the amount of the civil penalty agreed to by the parties is reasonable. EMC does not suggest what an appropriate civil penalty would be in this case, but simply argues that the Plaintiffs have not demonstrated that the amount in this case is consistent with either the EPA's or the State's policy on how such penalties should be calculated when settling CWA cases. However, neither policy establishes a mandatory method for calculating civil penalties; rather, both policies provide for flexibility, recognizing the importance of allowing the agency to take into account the particular circumstances surrounding a given situation. *See* EPA Interim Clean Water Act Settlement Penalty Policy at 3 (March 1, 1995), available at http://www.epa.gov/compliance/resources/policies/civil/cwa/cwapol.pdf (noting that "[i]n some cases, the calculation methodology set forth here may not be appropriate, in whole or in part"); IDEM Civil Penalty Policy (April 5, 1999), available at http://www.in.gov/idem/oe/nrp/civil.html ("Nothing in this policy precludes IDEM from imposing a civil penalty using an alternative approach or requires IDEM to impose a civil penalty for a violation."). Accordingly, assuming that EMC is correct that the penalties contained in the Decree are inconsistent with the Plaintiffs' general civil penalty calculation methodologies, that does not mean that they violate the Plaintiffs' policies.

As the court noted in *U.S. v. Comunidades Unidas Contra La Contaminacion*, 204 F.3d 275, 281 (1st Cir. 2000), whether the amount of the penalty imposed in a consent decree is reasonable must be examined as part of the court's duty to determine the decree's substantive fairness, which has been characterized as involving "concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." However, "these concepts do not lend themselves to verifiable precision. In environmental cases,

EPA's expertise must be given the benefit of the doubt when weighing substantive fairness." *Id.* Here there is nothing in the record that suggests to the Court that it should second guess the Plaintiffs' informed decision regarding the appropriate civil penalty to impose in this case.

*Supplemental Environmental Project*

EMC next raises several issues with regard to the SEP provided for in the Decree. Most of the issues raised by EMC relate to the fact that the Decree allows the City to attempt to recover the cost of the SEP in its third-party suit against EMC. Clearly EMC's own interests would have been better served if the Plaintiffs had forbidden the City from seeking reimbursement for the SEP from EMC. However, the Court disagrees with EMC's suggestion that the fact that the City has retained the ability to pursue its third-party complaint against EMC is inconsistent with the purpose and goals of the CWA. EMC argues that including a clause in a consent decree allowing for the possibility of reimbursement is "unprecedented" and that allowing the City to transfer its liability onto another party would eliminate any deterrent effect of the SEP. However, while the potential exists for the City to recover some or all of the cost of the SEP from EMC, the fact remains that the City is solely responsible under the Decree for completing the SEP regardless of the outcome of the third-party suit. This responsibility is a sufficient burden on the City to fulfill the goal of deterring future CWA violations.

EMC also questions the size of the SEP, arguing that its cost is out of proportion with the proposed civil penalty it is offsetting. While that argument might be relevant to whether the cost of the SEP is an appropriate measure of damages in the third-party suit, it is not relevant to whether it was appropriate to include the SEP in the Decree.

EMC also suggests that the SEP does not comply with the EPA's SEP Policy, which provides that "a SEP performed in settlement of an enforcement action must (1) be commenced after the Agency has identified a violation, and (2) provide EPA with the opportunity to help shape

11

the scope of the project before it is implemented." EMC Brief at 13 (citing U.S. Envtl. Prot. Agency, Final EPA Supplemental Environmental Projects Policy Issued, 63 Fed. Reg. 24,796, 24,798 (May 5, 1998)). EMC argues that the record demonstrates that the need for and feasibility of the sewer line extension project that makes up the SEP was something that the City had discussed and pursued independent of this case. In other words, the idea of extending the sewer lines at issue did not originate during the settlement negotiations in this case. The SEP Policy does not require that an SEP so originate, however. Rather, because "the primary purpose of this Policy is to obtain environmental or public health benefits that may not have occurred 'but for' the settlement, projects which the defendant has previously committed to perform or have been started before the Agency has identified a violation are not eligible as SEPs." It is hardly surprising for an SEP to involve work that a party has identified for some time as being desirable; the relevant question in such instances is whether the party finally obligated itself to do the work because of the EPA's enforcement efforts. *See* 63 Fed. Reg. 24,796, 24,797-798 (May 5, 1998) (defining SEPs as "environmentally beneficial projects which a defendant/respondent agrees to undertake in settlement of an enforcement action, but which the defendant is not otherwise legally obligated to perform"). In this case the answer to that question is in the affirmative, inasmuch as there is no evidence suggesting that the City had committed to completing the sewer line extensions prior to or independently of the negotiation of the Decree.[4]

EMC also suggests in passing that the EPA was not given the opportunity to help shape the scope of the SEP; however, as the Plaintiffs point out, the EPA did, in fact, shape the SEP by establishing deadlines for its completion as set forth in the Decree.

---

[4]This is not to say that the City may not ultimately have completed the project on its own even if it had not been included in the Decree as an SEP but, again, that is not the relevant inquiry in determining whether a project meets the definition of an SEP.

*EMC's Request for a Hearing*

Finally, EMC argues that "[w]hen a Court cannot clearly determine whether the proposed Consent Decree is fair, reasonable, consistent with applicable law, and in furtherance of the public interest, a factual hearing is appropriate." EMC Brief at 21. In this case, however, as already noted above, the Court has no difficulty in finding that the Decree should be approved. In approving a consent decree, it is not appropriate for the court to conduct the sort of "detailed and thorough investigation that it would undertake if it were actually trying the case." *Comunidades*, 204 F.3d at 281. There is simply nothing before the Court–in EMC's briefs or otherwise–that suggests that the Decree is illegal, a product of collusion, inequitable, or contrary to the public good. Absent such a suggestion, it would not be a wise use of the taxpayers' resources to convene a hearing in this matter.

## **CONCLUSION**

For the reasons set forth above, the Plaintiffs' Joint Motion in Support of Entry of Consent Decree is **GRANTED**; EMC's request for a hearing is **DENIED**; and EMC's objection to Magistrate Judge Hussman's ruling lifting the stay of the third-party litigation is **OVERRULED AS MOOT**. The consent decree and final judgment will be entered by the Court by separate entry this date.

SO ORDERED: 06/20/2011

*[signature: William T. Lawrence]*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification